**DREHER LAW FIRM**
Robert Scott Dreher (CSB No. 120527)
Robert Scott Norman (CSB No. TBD)
Historic Louis Bank of Commerce Building
835 Fifth Avenue, Suite 202
San Diego, CA 92101
619-230-8828 / fax 619-687-0136

Attorneys for Plaintiffs

*FILED*

07 DEC -7 PM 4: 40

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY: _____  DEPUTY

'07 CV   2305 LAB  PCL

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

PACIFIC BEACH UNIFIED METHODIST )
CHURCH, a California Religious )
Corporation; and its Pastor APRIL )
HERRON; )
)
Plaintiffs, )
)
vs. )
)
The CITY OF SAN DIEGO; CITY OF SAN )
DIEGO NEIGHBORHOOD CODE COM- )
PLIANCE DEPARTMENT; Mayor JERRY )
SANDERS, City Council Members SCOTT )
PETERS, KEVIN FAULCONER, TONI )
ATKINS, TONY YOUNG, BRIAN MAIEN- )
SCHEIN, DONNA FRYE, JIM MADAFFER, )
BEN HUESO, NCC Director MARCIA )
SAMUELS, NCC Land Development )
Investigator PAMELA JONES, and City )
Attorney MICHAEL J. AGUIRRE, in their )
official capacities; and DOES 1-25; )
)
Defendants. )
_____ )

Civil Case No.:

**COMPLAINT FOR DECLARATORY and INJUNCTIVE RELIEF and DAMAGES for VIOLATIONS OF THE RELIGIOUS LAND USE & INSTITUTIONALIZED PERSONS ACT OF 2000 (42 U.S.C. §2000cc et. seq.); THE UNITED STATES CIVIL RIGHTS ACT (42 U.S.C. § 1983); and THE UNITED STATES AND CALIFORNIA CONSTITUTIONS.**

**Jury Trial Demanded.**

**INTRODUCTION**

The City of San Diego has threatened to fine and punish a 60-year-old local church, the Pacific Beach Unified Methodist Church, its pastor, and its congregation, in order to intimidate, prevent and deter them from practicing the fundamental tenets of their Christian religion on their Church's property. The Church's "crime?" – sharing a meal and religious services with the poor, the hungry and the homeless, and others, on Wednesday nights. But there is no difference between the Church's ministry activities on Sundays (which the City has not questioned) and its ministry activities on Wednesdays, except the City's perception of the people who participate -- homeless, hungry and poor people are considered undesirable neighbors who should remain invisible. The City's actions violate the United States and California Constitutions, the Federal Civil Rights laws, prior Orders of this Court, and the Religious Land Use & Institutionalized Persons Act. Plaintiffs ask the Court to order the City to stop.

**JURISDICTION AND VENUE**

1.    The Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1343, and 42 U.S.C. §2000cc-2. This is a suit in equity authorized by law to be brought to redress the deprivation, and threatened deprivation, under color of law, ordinance, statute, regulation, custom and usage of the State of California, County of San Diego, City of San Diego of rights, of privileges and immunities secured by the laws and Constitutions of the State of California and the United States, particularly the First, Fourth, Fifth, Ninth, and Fourteenth amendments to the Constitution of the United States, the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), and the Civil Rights laws.

2.    Venue is proper in this District because the acts and transactions complained of occurred in this District, and the relief Plaintiffs seek is within this Court's power to grant.

## IDENTIFICATION OF PARTIES

3.    Plaintiff PACIFIC BEACH UNITED METHODIST CHURCH is a Religious Corporation and Church duly qualified under the law to minister, and ministering, in the County of San Diego, State of California. Located at 1561 Thomas Avenue, San Diego, CA 92109, it was incorporated in 1947 and has been operating with a congregation continuously on this site in Pacific Beach for nearly 60 years. The Church bought the property in 1968. Plaintiff APRIL HERRON is its Pastor. The Church, its Pastor and their congregation (collectively referred-to as Plaintiffs) are members of a Christian religious faith (United Methodist) whose religious beliefs and practices require foremost that they minister to and care for the hungry, homeless and poor. Indeed, doing so, and being able to do so freely, is at the core of Plaintiffs' religious and spiritual identities.

4.    John Wesley began what became the Methodist movement in England in the 1700's. From the start, Methodism was especially identified with the religious life of the lower and middle classes, and its ministers made no apology for concentrating their energies on the poor.[1] One of John Wesley's most famous aphorisms is "*Do all the good you can, by all the means you can, in all the ways you can, in all the places you can, at all the times you can, to all the people you can, as long as ever you can.*" Wesley wrote in his journal on January 4, 1785: "*At this season we usually distribute coals and bread among the poor of the society. But I now considered, they wanted clothes as well as food. So on*

---

[1]   Bloy, Marjie; John Wesley and Methodism, "A Web of English History" (http://dspace.dial.pipex.com/town/terrace/adw03/peel/religion/method.htm and www.historyhome.co.uk)

---

*this and the four following days I walked through the town and begged two hundred pounds [sterling] in order to clothe them that needed it most."*

5.    From Wesley's early sermons through today, Methodists are taught that "*He who had the love of God in his heart... was athirst to do good. The language of his heart continually was, 'My Father worketh hitherto, and I work.' My Lord 'went about doing good'; and shall not I 'tread in his steps'? As he had the opportunity, therefore ... he fed the hungry, clothed the naked, helped the fatherless or stranger, visited and assisted them that were sick or in prison.*" (Sermon on Scriptural Christianity.)

6.    It is without dispute that ministry to and feeding and shelter of the homeless are of the highest fundamental tenets of the Judeo-Christian religions, essential to the beliefs and practice of the Judeo-Christian faiths, and other faiths as well. The failure to make contributions of food, clothing and shelter to those who lack them is the "failure to obey a commandment of God and is thus a sin against God and man," (D'Arcy, Worthy of Worship – A Catholic Contribution, Religion and Morality (1973)).

7.    The Bible, which Plaintiffs follow, is replete with passages teaching that its God is especially concerned about the poor, that believers must love the poor, and that this love should result in concrete actions to deal with the needs of the poor. These passages are found in the Old Testament, but the concept of acts of charity as an essential part of religious worship is a central tenet of all major religions. The Biblical mandate to care for the poor is set forth in the book of Isaiah, where God asked "Is not this the fast that I choose…to share your bread with the hungry, and bring the homeless poor into your house; [and] when you see the naked, to cover them?" (Isaiah 58:6-7).

8.      Jesus Christ met the physical as well the spiritual needs of others, exemplified in feeding the hungry (<u>Matthew</u> 14:14-21; 15:29-34), giving sight to the blind (<u>Matthew</u> 9:27-31), cleansing the leper (<u>Matthew</u> 8:2-4), restoring sanity to the mad (<u>Mark</u> 5:1-20), strength to the lame (<u>John</u> 5:1-9), and even life to the dead (<u>John</u> 11:17-44).  Plaintiffs know that they will one day be judged on whether or not they gave food to the hungry, drink to the thirsty, welcome to the stranger, clothing to the naked, and care to the sick.  (<u>Matthew</u> 28:35-36).

9.      In referring to the hardness of heart which typified those who turned from God, Jesus said "You know that the rulers of the Gentiles lord it over them, and their great men exercise authority over them. It shall not be so among you; but whoever would be great among you must be your servant, and whoever would be first among you must be your slave, even as the Son of man came not to be served but to serve, and to give his life as a ransom for many." (<u>Matthew</u> 20:29-34).

10.      Jesus' teaching to feed the hungry, give water to those who thirst, invite the stranger into the home, clothe the naked, and visit those who are sick and in prison (<u>Matthew</u> 25:34) is viewed as a command to the faithful follower of Christ, for "Truly, I say to you, as you did it to one of the least of these brethren, you did it to me." (<u>Matthew</u> 25:39). As the apostle James instructed:

> "Now, what use is it, my brothers, for a man to say he has faith if his actions do not correspond with it? Could this sort of faith save anyone's soul? If a fellow man or woman has no clothes to wear and nothing to eat, and one of you say 'Good luck to you, I hope you'll keep warm and find enough to eat', and yet give them nothing to meet their physical needs, what on earth is that good for? Yet that is exactly what a bare faith without a corresponding life is like - quite dead." (James 2:14).

11.      This New Testament teaching is traced to the very earliest of Old Testament scripture.  The Book of Deuteronomy (one of "Books of the Law" or Torah) proclaims:

"Is there a poor man among you, one of your brothers, in any town of yours in the land that Yahweh your God is giving you? Do not harden your heart or close your hand against that poor brother of yours, but be openhanded with him and lend him enough for his needs. Do not allow this mean thought in your heart, 'The seventh year, the year of remission is near', and look coldly on your brother and give him nothing' he could appeal against you to Yahweh and it would be a sin for you...Of course there will never cease to be poor in the land. I command you, therefore: Always be openhanded with your brother, and with anyone in your country who is in need and poor." (<u>Deuteronomy</u> 15:7-12).

11.     This Old Testament scripture was recognized by Jesus in the incident of the woman who anointed him before the crucifixion, in which he declared that so long as the gospel was preached, she would be remembered: "The poor will always be with you" he said (<u>Matthew</u> 26:11). The first letter of the Apostle John declares:

"But if someone who is supposed to be a Christian has money enough to live well, and sees a brother in need, and won't help him - how can God's love be with him? Little children, let us stop <u>saying</u> we love people; let us <u>really</u> love them, and <u>show it</u> by our <u>actions</u>." (1 <u>John</u> 3:17 [Original emphasis. <u>Living Bible</u> translation]).

12.     This New Testament teaching echoes throughout the scriptures. In the words of the Psalmist, King David: "Happy is he who cares for the poor and weak." (<u>Psalm</u> 41:1).

13.     The teaching applies to the New Testament church. The apostle James wrote:

"My brethren, show no partiality as you hold the faith of your Lord of glory. For if a man with gold rings and in fine clothing comes into your assembly, and a poor man in shabby clothing also comes in, and you pay attention to the one who wears the fine clothing ans say "Have a seat here, please," while you say to the poor man, "Stand there," or "Sit at my feet," have you not made distinctions among yourselves, and become judges with evil thoughts? Listen, my beloved brethren. Has not God chosen those who are poor in the world to be rich in faith and heirs of the kingdom which he has promised to those who love him? But you have dishonored the poor man. Is it not the rich who oppress you, is it not they who drag you into court? Is it not they who blaspheme the honorable name which was invoked over you?"

If you really fulfill the royal law, according to the scripture "You shall love your neighbor as yourself," you do well. But if you show partiality, you commit sin, and are convicted by the law as transgressors. For whoever keeps the whole law but fails in one point has become guilty of all of it." (<u>James</u> 2:1-11).

14.    A sacred sacrament in the Church is the remembrance of the sharing of food at the Lord's supper, memorialized in the ceremony of communion.  At the Last Supper, before Jesus' crucifixion and resurrection, He took a cup, and when He had given thanks He said, "Take this, and divide it among yourselves; for I tell you that from now on I shall not drink of the fruit of the vine until the kingdom of God comes." And He took the bread, and when he had given thanks He broke it and gave it to them, saying, "This is my body which is given for you. Do this in remembrance of me."  And likewise the cup after supper, saying, "This cup which is poured out for you is the new covenant in my blood." (Luke 22:17-21).

15.    The significance of the holy communion to the Plaintiffs is summed-up in Luke 24:30-31: "When He was at the table with them, He took bread, blessed and broke it, and gave it to them. Then their eyes were opened and they recognized Him; and He vanished from their sight."  Christians such as Plaintiffs believe that they find/see/experience Christ when they break bread with strangers.  Plaintiffs can practice their faith fully only by inviting strangers into their church home and sharing a meal with them -- a meal modeled on holy communion and on the many meals that Jesus shared with friends and enemies, saints and sinners, large crowds and small groups.

16.    The sharing of food at the Lord's supper was debased in the church at Corinth, earning the wrath of the apostle Paul, who wrote:

> "But, as it is, when you are assembled in one place you do not eat the Lord's supper. For everyone tries to grab his food before anyone else, with the result that one goes hungry and another has too much to drink! Haven't you houses of your own to have meals in, or are you showing contempt for the church of God and causing acute embarrassment to those who have no other home?" (1 Corinthians 11:20-23 [Orig. emph. Phillips translation]).

17.    The meals shared among members of the early church were meant to make a symbolic declaration that the reign of God dissolves distinctions based on social class as

well as the value systems that reinforce such distinctions.  When congregations failed to honor this meaning in their practices, they were chastised by their leaders (Skinner, Matthew, <u>The Christian Century</u>, Nov. 27, 2007, vo. 124, No. 24, p. 38).  In his exposition of this passage of scripture, John Short, in <u>The Interpreter's Bible</u>, a twelve volume work of biblical scholarship, comments that:

> "Not only were there divisions in the church based on the differences in social status of the various members of the community, but these were emphasized by the social practice of many of those who attended the so-called "common meal" or "love feast."  Personal tastes and class consciousness and economic status were allowed to intervene in a particularly divisive and pernicious way. People of similar standing apparently drew instinctively together and shared their provisions with their own set to the exclusion of others. The cultured people would congregate in one group; the rougher, poorer members of the community would gather in another. Those from the slums were thus segregated from those who came, so to say, from the suburbs; the well to do were separated similarly for the poor; and the result was that a social occasion, closely associated with the sacramental rite of blessing and breaking the bread and spilling forth the wine, tore to shreds the whole idea of Christian Fellowship." (Vol. 10, <u>The Interpreter's Bible</u>, Abingdon Press, pps. 133-134).

18.    Jesus' command of duty to the poor and afflicted, and his proclamation that he came "not to abolish the law and the prophets," but "to fulfill them" (<u>Matthew</u> 5:17) is borne out in Old Testament scripture. <u>Proverbs</u> 21:13 declares: "He who shuts his ear to the poor man's cry shall himself plead and not be heard" and "He who gives to the poor shall never want, but he who closes his eyes to them will bear many a curse." (<u>Proverbs</u> 28:27). And elsewhere: "The virtuous man is concerned for the rights of the poor, but the wicked knows no such concern." (<u>Proverbs</u> 29:7).

19.    Jesus said: "A new commandment I give you: Love one another.  As I have loved you, so you must love one another. All men will know that you are my disciples if you love one another" (<u>John</u> 13:34).

20.    These then, are the central, core tenets of belief and action that govern the Plaintiffs, adhered-to in word and deed.  To adhere to the positive command of Jesus Christ is salvation. To turn from it is sin and death and eternal suffering.

21.    Plaintiffs have been threatened with state police action by the Defendants if they continue their religious practices of ministering to, and assisting others in ministering to, the poor, hungry and homeless on their own property.

22.    Plaintiffs have a religious obligation to minister to the hungry, homeless and poor and have carried out these obligations on their property in the fashion alleged herein for at least the past 14 years, and desire to continue to do so, and would continue to do so without hindrance or burden but for the Defendants' actions and threatened actions.

23.    Defendant CITY OF SAN DIEGO is a municipal corporation organized, acting and existing under the laws of California.  Individual Defendants JERRY SANDERS, SCOTT PETERS, KEVIN FAULCONER, TONI ATKINS, TONY YOUNG, BRIAN MAIENSCHEIN, DONNA FRYE, JIM MADAFFER, BEN HUESO, and MICHAEL J. AGUIRRE are the CITY's Mayor, City Council Members and City Attorney, respectively.   Individual Defendant MARCIA SAMUELS is the Department Director in the CITY OF SAN DIEGO NEIGHBORHOOD CODE COMPLIANCE DEPARTMENT ("DEPARTMENT") and Individual Defendant PAMELA JONES is a Land Development Investigator in the DEPARTMENT; both are responsible to carry-out the mandates of the City, City Council, the Mayor, and the DEPARTMENT and certain municipal codes, including the actions alleged here.  All the Individual Defendants are sued in their Official Capacities only, as Officials and employees charged with carrying out the CITY's and the DEPARTMENT's actions.

24.     Defendant NEIGHBORHOOD CODE COMPLIANCE DEPARTMENT is an agency of the CITY charged with "work[ing] in partnership with the people of San Diego to promote and maintain a safe and desirable living and working environment; to improve the quality of San Diego's neighborhoods through education, enforcement, and abatement; and to respond to community concerns and attain code compliance while maintaining high professional standards and continually seeking improvements and innovations."   NCC's "priorities" are defined by the CITY as follows:

## Priority I:

## Imminent Health and Safety Hazards & Environmental Protection

- Disturbance of coastal bluffs
- Disturbance of historical and archaeological resources
- Illegal grading of Environmentally Sensitive Lands
- Inadequate barriers for swimming pools/spas
- Leaking sewage
- Live, exposed electrical wires
- Uninhabitable living conditions
- Unstable structures and signs

## Priority II:

## Serious Code Violations

- Building, electrical, plumbing and mechanical violations
- Disabled access
- Encroachments in the public right-of-way that are hazardous or block visibility
- Inflammatory graffiti
- Non-permitted demolition
- Non-permitted grading
- Overheight fences or walls that are hazardous or block visibility
- Substandard housing conditions

## Priority III:

## Significant Code Violations and/or Conditions Adversely Impacting Quality Of Life

- Condominium conversions
- Mobile Home Park routine

- Garages illegally converted to living space
- Graffiti
- Illegal encampments with structures
- Illegal dwelling units
- Illegal uses

- inspections
- Noise that disturbs at least three (3) or more separate households
- Non-permitted construction
- Residential care facilities
- Vacant, unsecured structures

## Low Priority

- Billboards
- Elimination of off-street parking
- Encroachments in the public right-of-way
- Excessive storage
- Garage sales
- Newsracks
- Noise that disturbs two (2) or fewer separate households

- Non-permitted accessory structures
- Outdoor merchandise displays
- Overheight fences
- Removal of required landscaping
- Setback violations
- Signs
- Vehicle repair in residential areas

## No Code Compliance Action

- Flag poles
- Garages used for storage
- Lighting onto adjacent property
- Occupants (number of) in a dwelling unit

- Odors
- Recreational vehicles/boats on private property
- Satellite and radio antennae

## Not Under NCCD Jurisdiction and/or Unregulated by The City

- Aircraft noise
- Animal feces
- Blocking of private views
- Covenants, Conditions & Restrictions (CC&Rs)
- Dirty or worn carpets
- Distribution of handbills
- Elevators
- Illegal dumping
- Illegal encampments without structures
- Insect infestations

- Insect swarms
- Mold/mildew
- Property line dispute
- Rats/rodents
- Refrigerators (abandoned)
- Non-removal of trash and recycling containers after collection
- Rubbish
- Shopping carts (abandoned)
- Train noise
- Trash on vacant lots
- Weeds and brush

25.     Plaintiffs are informed and believe that at all times herein mentioned each of the Defendants was the agent, servant, and employee of each of the other Defendants, and each was acting within the time, place and scope of said agency and employment.

26.     Plaintiffs are unaware of the true names and legal capacities of the Defendants sued herein as DOES 1-25 and therefore sue those Defendants by fictitious names.  Plaintiffs will seek leave of Court to amend this complaint to allege their true names when ascertained.  Plaintiffs are informed and believe, and thereon allege, that each DOE Defendant is in some way responsible for the acts, omissions, and damages alleged herein.

## FACTUAL ALLEGATIONS

27.     Plaintiffs' religious beliefs and practices command that they love, help, share with and care for the hungry, the poor, and the homeless, and whose faith requires that this love be manifest in concrete actions visible before God, their community, and the world.  Plaintiffs manifest their religious beliefs with action by providing occasional community, food, care, and ministry on Wednesday nights on Church property and with appropriate sanitary, hygiene, safety and health safeguards, to a small group of homeless, low-income and poor people and others in need, both within and outside the congregation.  Many of these people have children and can afford an apartment or food, but not both.

28.    Plaintiffs' "Wednesday Night Ministry" is open to everyone and is regularly attended by approximately 150 people, and includes community, fellowship, singing, praying, a sermon, food and other services and gatherings, and generally lasts about 2-4 hours. When it's over, everybody leaves the premises (EXH 1). Similarly, Plaintiffs' Sunday ministry is open to everyone and is regularly attended by approximately 200 people, and includes community, fellowship, singing, praying, food, and other services and gatherings and lasts about 4 hours. When it's over, everybody leaves the premises. On Friday nights, Plaintiffs open their Church to regular meetings of Narcotics Anonymous, attended by approximately 80 people. It includes community, praying, fellowship and support. Plaintiffs also celebrate special Christian occasions such as Christmas and Easter with community meals that are attended by 100-200 people.

29.    Plaintiffs also manifest their beliefs by helping others, including the CITY itself, provide food, shelter and care to homeless people throughout the City. Plaintiffs participate in the CITY-funded *Interfaith Shelter Network Rotational Shelter Program* (RSN), in which, for two weeks a year, the Church serves as an emergency winter overnight homeless shelter. Plaintiffs' participation (through an agreement with the CITY), along with that of dozens of other churches in San Diego, in the RSN allows the City to maintain compliance with State and Federal low-income housing laws.

30.    Like their Friday and Sunday activities, Plaintiffs' Wednesday worship services and meals are open to everyone in need, including members of the church and visitors from the community. In addition to the prayers, songs and sermons, they include meals and free medical and dental examinations for low-income families, children, Church members, and homeless people. Plaintiffs have performed and do perform these services as their faith

commands, as religious activities on, and religious uses of, their Church property.   The

Bible, which plaintiffs follow, requires Plaintiffs to commit themselves to welcoming

strangers, especially homeless and poor strangers, into their midst and to seeing all people

as belonging to the family of God.  The Church provides a place of safety where the indigent

and the vulnerable can share food and humanity with the wealthy and strong, as the Bible

and God command (EXH 2).

31.    Defendants have at all times been aware that Plaintiffs have been doing so,

and that Plaintiffs desire to continue to do so and in fact must do so because of the

requirements of their religion and faith to minister to and help the poor, and that they will

continue to do so as long as such service is needed.  Defendants have at all times been

aware that Plaintiffs intend to continue to perform these activities on their property.  For at

least 14 years Plaintiffs have done so with the knowledge and encouragement of, and

without objection from, the CITY.  For the past 10 years Plaintiffs have done so with the

assistance of UCSD Medical School and other professionals.

32.    On Wednesday, October 31, 2007 at about 3:00 p.m. (2½ hours before the

start of that evening's Ministry), Plaintiffs were preparing to practice their religious beliefs in

this fashion when Defendants (in the person of JONES and with the Police at their disposal)

"raided" Plaintiffs' Church property without warning, in a show of authority designed to chill

the Plaintiffs' exercise of their ministry and intimidate Plaintiffs.

33.    Defendants stated that they needed to perform an "inspection" to determine

whether any laws, ordinances or municipal codes were being violated by Plaintiffs' activities.

Defendants said they were acting on an anonymous "complaint."  Defendants had no search

warrant nor did they have any knowledge or belief whether any crime was being committed,

what activities were involved, or what they were looking for.  Pastor HERRON inquired as to the nature of the complaint, the laws or ordinances involved, and the legal basis for the inspection, but Defendants refused to provide Plaintiffs with any information.  Defendants asked questions and toured the Church premises.  After 30 minutes, they left.

34.    Defendants did not disclose during this "inspection," or afterwards, that they were trying to find or create "violations" rather than making a "neutral" inspection.  The inspection was a ruse designed to give the illusion of due process, because Defendants had already decided that Plaintiffs' activities must be found to violate various unspecified and unknown zoning laws of the City, because Defendants do not want homeless people to have food and Defendants do not want Churches giving it to them.

35.    Defendants told Plaintiffs that Plaintiffs' continuation of these activities may result in law enforcement action by Defendants, whose result would be to prevent Plaintiffs from taking part in these worship and religious faith activities, a "substantial burden" on Plaintiffs' religious exercise if ever there was one.  Defendants revealed that they had never cited or inspected any other Church on any other day in this fashion or circumstance, and hence could not state the specific consequences to Plaintiffs if a "violation" were "found."

36.    Upon arriving back at their offices, Defendants began a frantic "search" for anything which might be said to be a "violation."  Defendants' marching-orders were to "find something" and they scoured the law books.  Defendants' true motivation is an institutional hostility to Plaintiffs' practice of religion to the extent that religion might benefit homeless people, a hostility to homeless people based on the misperception that homeless people are undesirable neighbors whose presence should be invisible, and a desire to foster politically-beneficial relations with wealthy constituents and interests.

37.   In the days following Defendants' "raid," Plaintiffs began to worry about their ministry.  On November 13, 2007, having heard nothing from the CITY, Pastor HERRON telephoned JONES, who stated only that her investigation concerned a "zoning issue."

38.   Ten days later, on November 26, 2007, JONES called Pastor HERRON and informed her ominously that the CITY intended to send Plaintiffs a "*Notice of Violation*" in the mail, and that it would take another "couple weeks to prepare" it.   Pastor HERRON again asked the CITY to disclose the specific Zoning Code references Plaintiffs were allegedly "violating."  JONES was unable to give HERRON any information, saying instead that the CITY was "still investigating" the matter.  Pastor HERRON asked JONES if the CITY was applying this decision to all churches in San Diego, and JONES said "no, just you."  "You'd better consult an attorney," JONES warned.

39.   Plaintiffs then began contacting other CITY officials in an effort to discover the nature of the forthcoming "charges" that would be contained in a "Notice of Violation." Nobody seemed to know anything.  Pastor HERRON left a telephone message with JONES' supervisor, Ida Ford, but Ford did not return the call.

40.   On November 27 Plaintiffs called Defendant FAULCONER's office and spoke to his aide, who curtly told Plaintiffs to contact JONES, that there had been "complaints," and Plaintiffs did so.  But JONES did not take the call so Plaintiffs left a message.

41.   HERRON, fearing that Plaintiffs' religious practices would be stifled, also sent Defendants a letter (Exh. 3).  She received no response.  Plaintiffs were now in limbo: Should they follow their faith and continue to worship as God commands (risking fine, jail, closure of the Church?), or follow the mandates of a CITY bureaucrat for no apparent reason, risking eternal damnation?

42.     Then, on November 29, 2007 (nearly a month, after the "inspection"), JONES left a message on Plaintiffs' telephone voicemail, stating that Defendants had finally found something.  Ignoring Pastor HERRON's letter, and the facts, Defendants had decided that Plaintiffs' religious activities were a violation of San Diego Municipal Code §§131.0406; 131.0420; 131.0422; and 141.0412(a)(3), and that Plaintiffs would receive the appurtenant "Notice of Violation" in the mail.

43.     These cited Municipal Code Sections read as follows:

**SDMC §131.0406**: *Residential Multiple Unit Dwelling Developments*

*"(a) The purpose of the RM zones is to provide for multiple dwelling unit development at varying densities. The RM zones individually accommodate developments with similar densities and characteristics. Each of the RM zones is intended to establish development criteria that consolidates common development regulations, accommodates specific dwelling types, and responds to locational issues regarding adjacent land uses.*

**SDMC §131.0420(a)**: *Use Regulations of Residential Zones.*

*"Within the residential zones, no structure or improvement, or portion thereof, shall be constructed, established, or altered, nor shall any premises be used or maintained except for one or more of the purposes or activities listed in Table 131-04B.  It is unlawful to establish, maintain, or use any premises for any purpose or activity not listed in this section or Section 131.0422."*

**SDMC §131.0422**: *Use Regulations Table for Residential Zones.*

*"The uses allowed in the residential zones are shown in the Table 131-04B." The table provides that "Homeless Facilities," including "congregate meal facilities," "emergency shelters," and "homeless day centers" are "not permitted" in residential zones."*

**SDMC §141.0412**: *Homeless Facilities.*

*(a) This section regulates the following homeless facilities:*
*(3) Homeless day centers: Any facility that provides basic services, including personal hygiene, information and referral, employment, mail, and telephone services, during daylight hours to homeless persons.*

44.    On December 4, 2007 Pastor HERRON telephoned JONES again to discuss these "charges," which Plaintiffs had not, as yet, received in writing.  On December 5, 2007 HERRON finally spoke with JONES, who said "We are still reviewing the whole thing."  As Plaintiffs had feared, JONES said that the CITY will either (a) require Plaintiffs to seek a Conditional Use Permit to continue their religious activities, or (b) require Plaintiffs to discontinue the activities in "their entirety."  She also threatened that consequences could include daily fines and a referral to the City Attorney for legal or court action.

45.    Such a "choice" is unlawful.  Defendants' threats to cite, fine, or enjoin Plaintiffs' religious practices, or force Plaintiffs to obtain special permits, are part of an effort to intimidate Plaintiffs into either (a) refraining from conducting activities which Plaintiffs are lawfully entitled to conduct, or (b) attempting to comply with an onerous, inapplicable, costly, lengthy, virtually-impossible public permit process (with which Plaintiffs are legally not required to comply) which would culminate in a sham "public hearing."  At such a "hearing" neighboring residents and business interests would be invited to declare (falsely) that Plaintiffs' religious activities must cease, lest they somehow lower property values and lure into the community an assortment of purportedly poor, unpleasant, undesirable people who nevertheless (a) are already there anyway and (b) have the absolute right to go into this neighborhood and Church at any time they choose, and who were made homeless or undesirable only because they lacked money, shelter, and food.

46.    The upshot of this process is that Plaintiffs' religious practices will be put to a "political test" of precisely the type which the Founders of this nation meant to avoid. Defendants foster the notion of "pending imminent arrest and citation" in order to chill, harass, impede, threaten, and discourage Plaintiffs' exercise of their religious beliefs.  It is

unconstitutional and illegal for the City to require votes to be taken in order to determine whether Plaintiffs are allowed to worship and carry out their faith in a manner acceptable to the City, staff and local neighborhoods in which the churches reside.

47.     Defendants' actions are motivated, in part, by a desire to serve politically and economically powerful interests, and, in part, by a desire to curb Plaintiffs' exercise of their religion in this fashion, lest it encourage or embolden other churches and faiths to fully exercise their religious freedoms in similar fashion.

48.     The zoning ordinances which Defendants claim to have been "violated" do not apply to Plaintiffs or their activities.  First, Plaintiffs' activities are lawful religious and church activities and uses conducted by and on church property, and as such are protected by U.S. and California Constitutions and RLUIPA from city and state zoning ordinance regulation. Second, the cited Municipal Code sections are facially inapplicable to Plaintiffs' activities.

49.     San Diego Municipal Code §131.0406 simply defines the "Residential Zone" in which Plaintiffs' Church is located, while §§131.0420 and 131.0422 combine to incorporate a list of approved and prohibited uses in that Residential Zone.  Section 131.0422 states that "Homeless Day Centers" are not permitted in the Residential Zone.

50.     PACIFIC BEACH UNITED METHODIST CHURCH is not, and does not operate, a "homeless day center" as defined in the SDMC -- Plaintiffs do not provide "basic services," "personal hygiene," "information and referral," "employment," "mail," or "telephone services" during daylight hours.  However, even if Plaintiffs did provide such services, they would be privileged to do so because it is a necessary part of their faith to do so, and has been since the 1700's.  It is a "church," defined under Municipal Code §113.0103 as "*an institution that people regularly attend to participate in or hold religious services, meetings,*

*or other activities.*"  Churches are a "Permitted" use category for RM zones, per §§131.0420 and 131.0422 cited by Defendants.  And at any rate, Plaintiffs' Church was operating, and Plaintiffs' were practicing their faith, in that fashion and at that location prior to the enactment of the subject Municipal Code sections.

51.    No City Zoning Ordinance can or does by its terms require a church to seek a permit or any other type of permission before providing services, ministry, prayer, community, food, water, care, or otherwise minister to the needs of homeless and poor people on church property.  Plaintiffs' activities are not "accessory uses" but are instead the *sine qua non* of Plaintiffs' faith.  Plaintiffs' Church is an existing place of religious worship, devoted to religious use, and Plaintiffs' fundamental religious obligations require that they offer this ministry. Any "permit" requirement, and any such interpretation by Defendants, are unlawful infringements of Plaintiffs' rights to freedom of speech and religion and as such violate the First and Fourteenth Amendments to the U. S. Constitution and Art. I, §4 of the California Constitution.  The CITY's actions are also a violation of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §2000cc et seq.  The CITY's actions are deliberately designed to chill Plaintiffs' free exercise of their religion.

52.    The First Amendment to the Constitution of the United States declares that Congress, and the State, "shall make no law respecting an establishment of religion,or prohibiting the free exercise thereof."  The California Constitution in Article I, §4, declares "Free exercise and enjoyment of religion without discrimination or preference is guaranteed."

53.    The Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §2000cc et seq., states that "No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a

person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden…is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest." Congress has specified that the RLUIPA must be interpreted and construed broadly and strongly in favor of protecting religious exercise: "[T]o the maximum extent permitted by the terms of this [Act] and the Constitution."

54.    Defendants' actions herein implement, and threaten implement, land use regulations in a manner that imposes a substantial burden on Plaintiffs' religious exercise and assembly. Defendants' actions lack compelling governmental interest. Defendants' actions impose a substantial burden on Plaintiffs' religious exercise by requiring the cessation of Plaintiffs' religious exercise.

55.    A dispute exists between Plaintiffs and Defendants which requires this Court to decide the issues presented here, so that Plaintiffs can continue their religious practices.

56.    Just over 20 years ago the City of San Diego attempted to enforce similar ordinances in a virtually identical situation, and Judge Edward Schwartz ordered it not to do so. (Sonrise Christian Fellowship v. City of San Diego, et al., (1985), U.S.D.C., Southern District of California, Case No. 85-1429 S). Nothing has changed. The CITY's actions described herein are a violation of the spirit, if not the letter, of that Order.

## FIRST CAUSE OF ACTION
### (Violation of 42 U.S.C. § 1983)

57.    Plaintiffs incorporate the allegations contained in paragraphs 1 – 56.

58.    Defendants' actions violate Plaintiffs' civil and constitutional rights including their rights under the First, Fourth, Fifth, Ninth, and Fourteenth amendments to the Constitution of the United States.

59.    Defendants did not act, and were not motivated, by a secular intent or desire to afford the equal and impartial application of the law, but rather acted with the purpose of deterring and preventing plaintiffs from exercising the rights secured to them by the Free Exercise Clause of the First Amendment to the Constitution of the United States.

60.    Plaintiffs are informed and believe that Defendants acted and were motivated by a desire to deprive and prevent the poor, dispossessed, and homeless from participating in the ministry offered by Plaintiffs' free exercise of their religious faith, and had actual animus toward said persons based upon a constitutionally-impermissible discrimination of wealth and economic position.

61.    Plaintiffs allege, on information and belief, that Defendants conspired with one another to deprive Plaintiffs of the rights secured to them under the First and Fourteenth Amendments to the Constitution of the United States.

### SECOND CAUSE OF ACTION
**(Violation of the Religious Land Use and Institutionalized
Persons Act of 2000, 42 U.S.C. §2000cc et. seq.)**

62.    Plaintiffs incorporate the allegations contained in paragraphs 1 - 61.

63.    Defendants' actions impose, and threaten to impose, land use or zoning regulations in a manner that imposes a substantial burden on Plaintiffs' religious exercise, including a religious assembly and institution.  Defendants' actions are not in furtherance of any compelling governmental interest, or are not the least restrictive means of furthering any governmental interest.   Defendants' actions violate 42 U.S.C. §§ 2000cc; 2000cc(a)(1); 2000cc(a)(2); 2000cc(b)(1), (2) and (3).

/ / /

### THIRD CAUSE OF ACTION
### (Civil Rights Violations)

64.    Plaintiffs incorporate the allegations contained in paragraphs 1 - 63.

65.    This lawsuit arises under the United States Constitution, particularly under the provisions of the Fourth, Fifth, Sixth and Fourteenth amendments to the Constitution of the United States, and Article I, Section 4 of the California Constitution.  Defendants' actions violate those Constitutions.

### FOURTH CAUSE OF ACTION
### (Declaratory Relief)

66.    Plaintiffs incorporate the allegations contained in paragraphs 1 - 65.

67.    An actual controversy exists regarding Plaintiffs' rights under the law and the use of their property.  Plaintiffs ask this Court to adjudicate the controversy by declaring an end to the alleged infringement on Plaintiffs' religious freedom.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment as follows:

1.    Injunctive relief preventing Defendants from requiring or purporting to require Plaintiffs (a) to comply with any zoning or land use or any other ordinance or (b) to make application for any Conditional Use Permit(s), in order to provide food, water, and/or other such items to homeless or other people on Church property;

2.    Injunctive relief preventing Defendants from purporting to enforce zoning or land use ordinances or municipal codes with respect to Plaintiffs' religious activities including the feeding of homeless and poor people on Church property;

3.    Injunctive relief preventing Defendants from interfering with such activities by Plaintiffs or any others similarly situated on church property;

4.    General damages in amount according to proof;

5.    Costs of suit and attorneys fees as allowed by law; and

6.    Such other relief that this court deems just and proper.

Dated:December 25, 2007                              DREHER LAW FIRM

By:    Robert Scott Dreher
       Robert Scott Norman
       Attorneys for Plaintiffs

## REQUEST FOR JURY TRIAL

Plaintiffs hereby request a jury trial on all issues.

Dated: December 25, 2007                             DREHER LAW FIRM

By:    Robert Scott Dreher
       Robert Scott Norman
       Attorneys for Plaintiffs

N:\JD\CASES\RSN\UMCcomplaint.doc

**Wednesday Night Ministry (Mission Statement adopted 8/21/01)**

"Come, you that are blessed by my Father, inherit the kingdom prepared for you from the foundation of the world; for I was hungry and you gave me food, I was thirsty and you gave me something to drink, I was a stranger and you welcomed me, I was naked and you gave me clothing, I was sick and you took care of me, I was in prison and you visited me."   Matthew 25:34-35

The purpose of our program is to feed hungry people and to offer an experience of caring community.

Each Wednesday night the Pacific Beach United Methodist Church offers a free meal to all guests who would like to attend.  All are welcome, except those who are drunk, carrying weapons, or under the influence of drugs. Guests are greeted at the door, pass through a cafeteria-style line, and then find seats in our church social hall.  Once all guests are served, a brief reflection on spiritual themes, a prayer, and community announcements are offered.  After that, second helpings become available.

For those guests who are interested, medical, dental, and acupuncture clinics are available.  There is no charge; guests make appointments as they enter for the meal.  PB UMC hosts these clinics as a way to support health and healing for all.  Other social and legal services are periodically available.

Once guests finish their meal and complete any health-related appointments they may have, they leave the premises.  PB UMC does NOT allow anyone to spend the night or sleep on church grounds.  We do NOT allow the buying, selling, or using of drugs (including alcohol) on church property.

Many of the volunteers who help to operate the program are themselves homeless, or were homeless at one time.  The program is a remarkable example of people coming together from all walks of life to share their gifts and care for one another.  We welcome the participation of everyone who can make a positive contribution.  We do not discriminate against anyone on the basis of religion, age, race, gender, marital status, physical condition, sexual orientation, ethnic background, or economic situation.

EXH. 1



December 11, 2007

Dear Friends,

Below you will find excerpts from an essay written by 9-year-old congregation member Elizabeth Wilde. As you read what Elizabeth wrote, perhaps you will understand why PB UMC's Christmas offering this year will be dedicated to helping those in our community who are homeless and without financial resources of their own. Our gifts will be directed to two organizations that are our close partners in ministry: The Community Christian Service Agency and The Welcome Door. Here is Elizabeth's experience:

*Last Wednesday night, I helped my church, the Pacific Beach United Methodist Church, to feed the people who live on the streets. We fed people who do not have a home like you and I but rather live under bushes, next to rivers, and on the streets. Most of the people are covered in dirt and more dirt. They cannot afford dental care or health care so our church provides medical and dental care to them.*

*The homeless really really appreciate a cornbread muffin, some butter and a cup of milk especially since they have next to nothing to eat all day and perhaps all week. They were very grateful for the food we provided to them and were very happy to have a heaping plate of hot food.*

*The homeless people that we served were of all ages including children. I was very surprised to see children because I didn't think children could be homeless. It made me feel kind of sad because I know they are not getting a healthy start to their lives.*

*I am more grateful for all of the books and some of the toys I have because I saw children who are not as fortunate as I am.*

*I cannot change what they have done in their past but I can change their future by cooking a meal for them and serving it at my church.*

We can all change the future by offering hope and specific forms of help through the Community Christian Service Agency and The Welcome Door. You may use the envelope provided to return your gift. I look forward to see you at "The Homecoming" on December 16 (9 a.m., 10:30 a.m. and 6 p.m.) and at our Christmas Eve worship services (December 24 at 7 and 9 p.m.)

God bless us, every one, this Christmas!

Pastor April

Pacific Beach United Methodist Church
1561 Thomas Ave., San Diego, CA 92109
858-274-6573    www.MyPBChurch.org

ISBN 6-0002-0220-2
Photography: Stained glass window, Church of St. Robert Bellarmine, Omaha, NE. Copyright © Crosiers/Eugene Plaisted. Used by permission.
Printed in USA. Copyright © 2005 Augsburg Fortress.

EXH 2

# Pacific Beach United Methodist Church

1561 Thomas Avenue at Ingraham
San Diego, CA 92109-4398
(858) 274-6573

April Marie Herron
Pastor



November 27, 2007

Ms. Pamela Jones
Neighborhood Code Compliance
City of San Diego
1200 Third Ave, 8th Floor, MS 51N
San Diego, California 92101-4106

Dear Ms. Jones,

Thank you for your phone call of November 26, 2007. I am writing to request that you reconsider your stated intention to send the Pacific Beach United Methodist Church a "notice of violation." You and your supervisor, Ms. Ford, seem to be under the impression that we are doing something here which is beyond the scope of what a church might be expected to engage in. I assure you that is not the case.

A fellow church leader (John Ed Mathison) articulates the purpose of the church succinctly: "The church (In all times and places) exists to exalt Jesus Christ and to help us walk in his steps." Indeed, our mission is guided by the words and the actions of Jesus. When Jesus described his own ministry, he said, "the blind receive their sight, the lame walk, the lepers are cleansed, the deaf hear, the dead are raised, the poor have good news brought to them" (Luke 7:22). We take to heart Jesus' instructions that we, his followers, should "Proclaim the good news 'the kingdom of heaven has come near.' Cure the sick, raise the dead, cleanse the lepers, cast out demons, give freely as you yourselves have received" (Matthew 10:7-8). We are mindful that Jesus told us we will one day be judged on whether or not we gave food to the hungry, drink to the thirsty, welcome to the stranger, clothing to the naked, care to the sick, time and attention to those in prison (Matthew 28:35-36).

We practice our religion in all of the following ways, and more: Praying, singing hymns, studying scripture, offering hospitality, feeding the hungry, caring for the sick, joining in corporate worship, donating to food and clothing banks, giving time, sharing talent, and offering resources in Christ's service. Sometimes "feeding the hungry" takes the form of Holy Communion, a specific ritual in which we partake of the body and blood of Christ. Other times it takes the form of an open meal in which church members and neighbors in the community come together for food and fellowship. Sometimes "caring for the sick" involves taking flowers to a hospitalized church member. Other times in involves offering a place where the indigent and vulnerable of our community can receive medical care. In other words, what we do at our church on Wednesdays is as integral to our purpose and identity as what we do on Sundays or any other day of the week.

Our worship services and our meals are open to all. In both cases, participants are a mixture of church members and visitors from the community. In both cases, some participants have financial means and some do not. We do not discriminate in any way. Anyone is welcome to sign up for a free consultation with a medical, dental, or acupuncture student. These "clinics" are licensed and properly supervised under the auspices of UCSD Medical School and the Pacific College of Oriental Medicine, respectively. No fees are charged and no money exchanged for services. Those who seek care at the clinics tend to be members of the community who have no other access to health services -- thus we feel this is an especially pertinent instance of following in the footsteps of Jesus.

Our church has been at its current location since the 1950's. All of our current ministries have been operating as they are today since at least 1997. I remain confused about what has suddenly changed about the definition of "church" in the city codes that would require you to begin attempting to curtail the spectrum of ministries at the

email: admin@pbumc.org
website: www.pbumc.org

EXH 3

Pacific Beach United Methodist Church or any other church. You made reference in today's phone call to some internal city memos from 1987 which pertained to the Interfaith Shelter Network organized by the San Diego Ecumenical Council. I do not have copies of those memos, but I see no reason why participation with the Interfaith Shelter Network should mean we would have to restrict our other ministries.

I appreciate your attention to this matter. I am sending copies of this letter to elected city officials in case their insights would be helpful. I enjoyed meeting you when you came to the church as required to investigate an anonymous complaint. I would welcome the opportunity to meet with you and/or your supervisor to further discuss our church's theology and mission. I would also be glad to provide further written documentation to the effect that our activities fall well within the common understanding of what a Christian church is supposed to be and do.

Sincerely,

The Rev. April Herron

email: admin@pbumc.org
website: www.pbumc.org

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS

PACIFIC BEACH UNIFIED METHODIST CHURCH, a California Religious Corporation; and its Pastor APRIL HERRON

**(b)** County of Residence of First Listed Plaintiff   San Diego County
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
(See Attachment)

## DEFENDANTS

The CITY OF SAN DIEGO, et al. (See Attachment)

County of Residence of First Listed Defendant   San Diego County
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

'07 CV 2305 LAB POR

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                    and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | | | ☐ 950 Constitutionality of State Statutes |
| | ☒ 440 Other Civil Rights | ☐ 555 Prison Condition | | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 U.S.C. 2000cc et seq.
Brief description of cause:
For injunctive and declaratory relief against the City of San Diego for Const. Rights violations.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE

DOCKET NUMBER

DATE
12/07/2007

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # 145294   AMOUNT 3501   APPLYING IFP   JUDGE   MAG. JUDGE

12/7/07

Pacific Beach United Methodist Church, et al. v. The City of San Diego, et al.
United States District Court, Southern District of California


## ATTACHMENT TO CIVIL COVER SHEET


**Item 1(a) Defendants**

The CITY OF SAN DIEGO; CITY OF SAN DIEGO NEIGHBORHOOD CODE COM-
PLIANCE DEPARTMENT; Mayor JERRY SANDERS, City Council Members SCOTT
PETERS, KEVIN FAULCONER, TONI ATKINS, TONY YOUNG, BRIAN MAIEN-
SCHEIN, DONNA FRYE, JIM MADAFFER, BEN HUESO, NCC Director MARCIA
SAMUELS, NCC Land Development Investigator PAMELA JONES, and City Attorney
MICHAEL J. AGUIRRE, in their official capacities; and DOES 1-25;


**Item 1(c) Attorneys for the Plaintiff:**

> **DREHER LAW FIRM**
> Robert Scott Dreher (CSB No. 120527)
> Robert Scott Norman (CSB No. TBD)
> Historic Louis Bank of Commerce Building
> 835 Fifth Avenue, Suite 202
> San Diego, CA 92101
> 619-230-8828 / fax 619-687-0136

**UNITED STATES
DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

# 145294     — SR

December 07, 2007
16:39:17

**Civ Fil Non-Pris**
USAO #.: 07CV2305 CIV. FIL.
Judge..: LARRY A BURNS
Amount.:                    $350.00 CK
Check#.: BC#1451

Total-> $350.00

FROM: PACIFIC BEACH UNITFIED CHURCH
      CITY OF SD
      CIVIL FILING